IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 10-112-LPS |
| | ) | |
| XIANG LI, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S REPLY TO DFENDANT'S SENTENCING MEMORANDUM

The United States respectfully submits this brief response to the principal arguments raised in Defendant's Sentencing Memorandum.

First and foremost, the Government has not perpetuated a "math myth" by "overstating, for various reasons told or untold, or even manipulating numbers to impress the public that the 'Infringement Amount' as caused by Defendant is more than $100 million . . . ." Def. Sent. Mem. at 3. The retail values of the software unlawfully pirated by Defendant were not made up out of whole cloth. They were instead provided to the Government by the companies that own the intellectual property rights to that software.

Prior to the filing of Defendant's sentencing memorandum, the undersigned counsel was under the impression that Defendant did not dispute the retail value of the software at issue. Instead, we understood Defendant to argue that he simply did not obtain any amount of money close to this retail value. Because we did not believe there was any dispute as to the retail value, we simply summarized those values in our opening memorandum.

Because Defendant now attempts to dispute the underlying retail values of the software at issue, the Government submits, as sealed exhibits, the pricing information relating to the

1

software products referenced in the charts contained on pages 18 and 19 of the Government's Sentencing Memorandum. *See* Pricing Information (Exs. 39-48) (filed under seal). This pricing data was provided to the Government by the victim companies that control the intellectual property rights to the pirated software. As to most of the software, the companies provided pricing information after reviewing the specific versions and modules of the software that Defendant delivered to the undercover agents. In a few instances (such as with Oracle's Primavera software or Siemens' NX software), the companies provided the pricing information for the software versions referenced in Defendant's emails with his customers. Thus, this pricing information stands in stark contrast to the generalized, weakly sourced and vague information that Defendant proffers in an attempt to dispute the retail values provided by the victims.

The Government wishes to emphasize a more basic point: the charts contained in its sentencing memorandum (and the attached pricing data that underlies those charts) are conservative estimates of only a fraction (about 22%) of the total pieces of software that Defendant unlawfully copied and distributed. Indeed, the first chart summarizes retail prices for only 144 out of over 700 unlawful transactions. The second chart summarizes retail prices for only those software programs that Defendant delivered to the agents in Saipan. As grossly distorted as Defendant's attempt to dispute these retail values is, it still amounts to nothing more than quibbling at the margins of the infringement amount at issue.

Defendant's claim that the software he distributed was worth only $2,544,625 is simply laughable – and completely baseless in light of the pricing data given to the Government by the companies that own and license the distribution of the software. Defendant hand-delivered software worth more than his claimed total infringement amount to the agents in Saipan alone. Even if we disregarded all of the 700+ transactions Defendant engaged in through the Crack99

2

website, Defendant still would have unlawfully copied and distributed software worth nearly double what he claims the total infringement amount to be.  Accepting Defendant's conclusion as true for the sake of argument, the average retail value for an item of software sold by Defendant would be about $3,635.  Just based on the software titles that are illustrated in the Government's Sentencing Memorandum alone, Defendant's claim is simply preposterous.

For the reasons explained in the Government's Sentencing Memorandum, the Probation Office has correctly estimated the loss value in this case as between $50 million and $100 million.  Defendant's sales of the Catia software alone place the "infringement amount" at over $50 million.  The Court "need only make a reasonable estimate of the loss" for purposes of determining which level enhancement applies under Section 2B1.1.  *See* U.S. Sentencing Guidelines Manual § 2B1.1 App. Note 3(B).  The Probation Officer and the Government have done so.  Defendant can offer no persuasive basis for disputing the retail values provided to the Government by the victim companies for the actual software that Defendant stole.

Second, it is absolutely false for Defense counsel to claim that Defendant assisted the Government in the investigation and prosecution of his own criminal conduct or that of other individuals.  He did nothing of the sort.

First, the Government gained access to Defendant's email accounts through search warrants, not through Defendant's disclosure of "his emails address(es) and passwords."  Def. Sent. Mem. at 7.

Second, Defendant contributed absolutely nothing to the prosecution of Wronald Best and Cosburn Wedderburn, two of his customers.  Both customers pled guilty to their criminal involvement with Defendant well before Defendant pled guilty in this case.  Both attempted to cooperate with the Government against Defendant, not vice versa.  The Government assembled

every fact that it had against those two customers through search warrants and other sources, without any information provided by Defendant. He contributed absolutely zero toward the prosecution of these two individuals. To claim otherwise is blatantly false.

Moreover, Defendant was given numerous opportunities to provide information about other international cybercriminals who played roles in his or other cybercrime organizations. Although he met with the Government on multiple occasions, Defendant provided no information that could even remotely be linked to other criminal actors in China or elsewhere. In short, he could have exposed other Chinese cybercriminals, and he failed to do so. His sentence should, in no way, be mitigated based on the assertion that he somehow cooperated with the Government against other individuals.

Third, and finally, the Court should reject Defendant's request to "strike" the Government's Sentencing Memorandum. The Government filed its Sentencing Memorandum on May 30 – just as Defendant did. Under the Court's scheduling order, the Government could have waited until today (8 days before sentencing) to reply to Defendant's sentencing memorandum. As it often does in criminal cases, the Government contemplated abstaining from filing an initial sentencing memorandum in favor of simply filing a reply to Defendant's Sentencing Memorandum. Due to the complex nature of the case and because Defendant did not file his sentencing memorandum prior to the 14-day period prescribed by the Court's normal sentencing order, the Government chose to file an initial memorandum on May 30 (the same day Defendant filed his memorandum), rather than waiting until today to present all of its arguments. The Government filed its initial memorandum before Defendant filed any memorandum to provide the Court with more time to consider the complex facts of this case. There was no

4

prejudice in the Government's doing so, and there is no basis for "striking" the Government's submission.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 210 months of imprisonment, and 3 years of supervised release.

    Respectfully submitted,

    CHARLES M. OBERLY, III
    United States Attorney

By:   /s/ David L. Hall
    David L. Hall
    Assistant United States Attorney

By:   /s/ Edward J. McAndrew
    Edward J. McAndrew
    Assistant United States Attorney

Dated:   June 3, 2013