IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XIANG LI, | : | |
| | : | |
| Movant/Defendant, | : | |
| | : | |
| v. | : | Civ. Act. No. 15-257-LPS |
| | : | Cr. Act. No. 10-112-LPS |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent/Plaintiff. | : | |

_____

Peter Goldberger, Esquire.  Attorney for Movant.

Shannon Thee Hanson, Assistant United States Attorney, United States Department of Justice, Wilmington, Delaware.  Attorney for Respondent.

## **MEMORANDUM OPINION**

July 28, 2017
Wilmington, Delaware

STARK, U.S. District Judge:

## I.     INTRODUCTION

Movant Xiang Li ("Movant") filed a timely Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. (D.I. 103) The United States ("Government") filed an Answer in Opposition. (D.I. 114) For the reasons discussed, the Court will deny Movant's § 2255 Motion without holding an evidentiary hearing.

## II.    BACKGROUND

On April 3, 2012, a federal grand jury returned a forty-six count Superseding Indictment against Movant alleging violations of the following statutes: Conspiracy to Circumvent a Technological Measure that Protects a Copyrighted Work, 18 U.S.C. §§ 371 and 2, 17 U.S.C. §§ 1201(a)(1). and 1204; Conspiracy to Traffic in Access Control Circumvention Tools and Services, 18 U.S.C. §§ 371 and 2, 17 U.S.C. §§ 1201(a)(2), and 1204; Conspiracy to Commit Criminal Copyright Infringement, 18 U.S.C. §§ 371 and 2, 18 U.S.C. § 2319(a)(1)(B); Conspiracy to Commit Wire Fraud, 18 U.S.C. §§ 1343 and 1349; Circumvention of Technological Measure that Protects a Copyrighted Work, 17 U.S.C. §§ 1201(a)(1), 1204, and 2; Trafficking in Access Control Circumvention Tools and Services, 17 U.S.C. §§ 1201(a)(2), 1204 and 2; Criminal Copyright Infringement, 18 U.S.C. §§ 2319(a)(1)(B) and 2; Trafficking in Counterfeit Labels, Documentation, and Packaging, 18 U.S.C. § 2318(a) and 2; Interstate Transportation of Stolen Property, 18 U.S.C. §§ 2314 and 2; Smuggling of Goods into the United States, 18 U.S.C. §§ 545 and 2; and Wire Fraud, 18 U.S.C. § 1343.

On January 7, 2013, Movant pled guilty to Counts Three and Four of the Superseding Indictment, which charge him with Conspiracy to Commit Criminal Copyright Infringement and Conspiracy to Commit Wire Fraud. (D.I. 56; D.I. 89) The Court sentenced Movant on June 11,

2013 to 144 months of incarceration, which included concurrent sentences of 60 months on Count Three and 144 months on Count Four. (D.I. 85)

Movant filed a notice of appeal. (D.I. 87) On or about September 9, 2013, the Government filed a Motion for Summary Affirmance to enforce the appellate waiver contained in Movant's Plea Agreement. (D.I. 114 at 3) On November 20, 2013, the Third Circuit entered an order summarily affirming Movant's conviction and sentence based on the valid appellate waiver. The Third Circuit denied Movant's Petition for Rehearing En Banc on December 23, 2013, and its summary affirmance in lieu of a formal mandate was transmitted to the Court on December 31, 2013. (D.I. 92)

Represented by counsel, Movant timely filed the pending § 2255 Motion asserting the following two grounds for relief: (1) defense counsel provided ineffective assistance at sentencing by failing to advance the correct objection to the "loss" enhancement used to calculate Movant's advisory Guidelines range; and (2) the Court imposed Movant's sentence "in violation of the law," due to the "serious miscalculation of the applicable Sentencing Guidelines." (D.I. 103 at 4-5) Movant contends that the Court should not enforce the collateral attack waiver provision in his Plea Agreement because the waiver was the result of defense counsel's ineffective assistance. In its Answer, the Government contends that the collateral attack waiver bars the Court from considering Claim Two, but concedes that the appellate/collateral attack waiver should not be enforced to bar consideration of the ineffective assistance of counsel argument in Claim One. (D.I. 114)

In response to the Government's Answer in Opposition, Movant filed a *pro se* Motion to Amend, seeking to add a new claim alleging his actual innocence of the wire fraud conspiracy conviction charged in Count Four of the Indictment (hereinafter referred to as "Claim Three").

2

(D.I. 115 at 1)  Movant's counsel filed a Motion for an Extension of Time to File a Reply to the Government's Answer, explaining that he wanted time to consult with Movant and evaluate Movant's requested amendment.  (D.I. 116)  Thereafter, Movant's counsel filed a Reply to the Government's Answer, raising the "actual innocence" argument presented in Movant's *pro se* motion.  (D.I. 117)  The Government filed a Sur-Reply rejecting the "actual innocence" argument on the basis of the collateral attack waiver (D.I. 117), to which Movant's counsel filed a Reply in Support of Motion to Amend (D.I. 119).

## III.   MOTION TO AMEND

In his *pro se* Motion to Amend, Movant asserts that he is actually innocent of the wire fraud conspiracy because "none of the conduct admitted by this defendant, or proffered by the Government during the plea hearing, falls within the ambit of either the wire fraud statute or the conspiracy to commit wire fraud . . . .  The conduct in this case is more akin to a burglary, and does not bear any fraudulent characteristics."  (D.I. 115 at 2)  Movant's counsel filed a Reply in Support of the Motion to Amend, which incorporates the "actual innocence" argument but describes the argument as alleging that Count Four of the Indictment lacks a factual basis.  (D.I. 117 at 34)

Federal Rule of Civil Procedure 15(a)(1)(B) provides that a plaintiff may amend his pleading once as a matter of course within 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.  *See* Fed. R. Civ. 15(a)(1)(B).  Since Movant filed his *pro se* Motion to Amend (D.I. 115) within 21 days after the Government filed its Answer in opposition, the Court will grant the Motion to Amend.  However, the Court will deny as moot Movant's Motion for an Extension of Time to file a Reply (D.I. 116), since Movant has filed a Reply in the interim.

3

Given these circumstances, the Court views the instant § 2255 proceeding as involving the

following three Claims: (1) defense counsel provided ineffective assistance during sentencing; (2) the

Court imposed an illegal sentence due to its miscalculation of the Sentencing Guidelines range; and

(3) Movant is actually innocent of the wire fraud conspiracy alleged in Count Four because there was

no factual basis for including Count Four in the Indictment.

## IV.   DISCUSSION

Movant's Plea Agreement contains the following appellate/collateral attack waiver provision:

> The defendant knows that he has, and voluntarily and expressly waives, the
> right to file any appeal, any collateral attack, or any other writ or motion after
> sentencing -- including, but not limited to, an appeal under 18 U.S.C. § 3742
> or 28 U.S.C. § 1291, or a motion under 28 U.S.C. § 2255 -- except that the
> defendant reserves his right to appeal only if (1) the Government appeals from
> the sentence, (2) the defendant's sentence exceeds the statutory maximum for
> the offense set forth in the United States Code, or (3) the defendant claims his
> sentence unreasonably exceeds the Sentencing Guidelines range determined
> by the District Court in applying the United States Sentencing Guidelines.

(D.I. 56 at ¶ 13) The Government contends that the collateral attack waiver provision bars the

Court from reviewing Claim Two from the original § 2255 Motion and Claim Three ("actual

innocence") from the Motion to Amend/Reply. (D.I. 114; D.I. 118) Although the Government

concedes that the collateral attack waiver provision does not bar the Court from reviewing Claim

One, it contends that the Court should deny Claim One as meritless. (D.I. 114)

### A.   Claims Two and Three: Barred by Collateral Attack Waiver

A court has an affirmative and "an independent obligation to conduct an evaluation of the

validity of a collateral waiver." *United States v. Mabry*, 536 F.3d 231, 238 (3d Cir. 2008). Specifically, a

court must consider: (1) whether the waiver was knowing and voluntary; (2) whether there is an

4

exception to the waiver which prevents its enforcement; and (3) whether enforcement of the waiver would cause a miscarriage of justice. *See United States v. Goodson*, 544 F.3d 529, 536 (3d Cir. 2008).

### 1. Voluntary and Knowing Nature of Waiver

The threshold issue in determining if the collateral attack waiver provision in Movant's Plea Agreement bars the Court from reviewing Claims Two and Three is whether the provision is enforceable. As a general rule, courts will enforce a collateral attack waiver if the waiver is "entered knowingly and voluntarily and [its] enforcement does not work a miscarriage of justice." *Mabry*, 536 F.3d at 236-37. When analyzing if a movant knowingly and voluntarily agreed to waive his right to lodge a collateral attack, the reviewing court must determine if "the district court inform[ed] the defendant of, and determine[d] that the defendant under[stood] . . . the terms of any plea agreement provision waiving the right to appeal or to collaterally attack the sentence as Federal Rule of Criminal Procedure 11(b)(1)(N) requires." *Mabry*, 536 F.3d at 239.

Here, as mandated by *Mabry*, the transcript of the plea hearing reflects that the Court explained the specific terms of the Plea Agreement and questioned Movant to confirm that he understood the meaning of the provisions. The Court assured that Movant was competent, and that he had a full opportunity to discuss the agreement with counsel and make an informed decision. Notably, the Court reviewed the waiver paragraph with Movant in detail, and explained the rights Movant was relinquishing in exchange for the deal with the Government. The Court further assured that the plea was entered knowingly and intelligently, with regard to the plea in general and the appellate/collateral attack waiver in particular. (D.I. 89 at 13-15) The Court also notes that the Third Circuit enforced the appellate waiver and dismissed his direct appeal after determining that Movant knowingly and voluntarily entered into the waiver.

5

Thus, the Court concludes that Movant's waiver of his collateral rights in exchange for certain promises from the Government was knowing and voluntary.

## 2. Scope of the Waiver

The next question is whether Claims Two and Three fall into any of the exceptions to the waiver. They do not. The Government did not appeal the sentence, and Movant does not challenge his sentence on the ground that it exceeds the statutory limits or unreasonably exceeds the Sentencing Guidelines range determined by the Court.

## 3. Miscarriage of Justice

Finally, the Court must determine if enforcing the waiver will result in a miscarriage of justice. There is no list of specific circumstances that would constitute a miscarriage of justice. *See Mabry,* 536 F.3d at 242. Rather, when considering this prong of the inquiry regarding the validity of a collateral waiver, a court must apply a common sense approach and evaluate "the clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government and the extent to which the defendant acquiesced in the result." *Id.* at 242-43. Granting an exception to a waiver based on a miscarriage of justice must be done "sparingly and without undue generosity." *United States v. Wilson*, 429 F.3d 455, 458 (3d Cir. 2005).

Here, Movant asserts that the collateral attack waiver cannot be enforced at all. He asserts that defense counsel was "ethically disabled from providing advice" to Movant about the waiver given defense counsel's role as Movant's advocate, and that defense counsel's act of providing such advice amounted to a conflict of interest. The Court disagrees. The Third Circuit has uniformly upheld the use of such waivers when, as here, the district court engaged in an appropriate Rule 11

6

plea colloquy. *See United States v. Lawton*, 640 F. App'x 146, 150 (3d Cir. 2016). Second, the Court has not found any Third Circuit case finding that a collateral waiver generates an inherent conflict of interest between counsel and client, and Federal Rule of Criminal Procedure 11(b)(N) expressly contemplates appeal and collateral waiver provisions. Third, Movant does not allege, and has not demonstrated, that defense counsel operated under an actual conflict of interest that adversely affected Movant's decision to plead guilty. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Fourth, Movant's assertion that he received nothing in exchange for pleading guilty is unfounded. Movant's total exposure under the Superseding Indictment equaled 435 years, yet his exposure under the plea was capped at 240 months, and he received a three-level reduction in his advisory Guidelines range (equal to more than 60 months). Additionally, all charges against his wife were dismissed as a result of the Plea Agreement. Finally, the record clearly reflects that Movant entered into the Plea Agreement knowingly and voluntarily (D.I. 89),[1] and the Court's sentence was below the advisory Guidelines range.[2]

For all of these reasons, the Court concludes that enforcing the collateral attack waiver will not result in a miscarriage of justice. Defense counsel's advice regarding the appellate/collateral attack waiver did not prevent Movant from understanding his plea or from filing an appeal and/or

---

[1]The Government's thorough explanation demonstrates why Movant's plea was knowing and voluntary. (D.I. 118 at 2-3)

[2]As discussed more fully in its discussion of Claim One, the Court's adoption of the "loss" calculation of over $100 million proposed by the Probation Office and the Government, which led to Movant's Sentencing Guidelines range, was legally and factually correct.

7

§ 2255 motion as permitted by his Plea Agreement. *See United States v. Shedrick*, 493 F.3d 292, 298 (3d Cir. 2007). Accordingly, the Court will deny Claims Two and Three as barred by the collateral attack waiver provision in Movant's Plea Agreement.

## B. Claim One: Ineffective Assistance of Counsel

Movant has properly raised his ineffective assistance of counsel allegation in the instant § 2255 Motion. *See Massaro v. United States,* 538 U.S. 500 (2003). As a general rule, ineffective assistance of counsel claims are reviewed pursuant to the two-pronged standard established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under the first *Strickland* prong, Movant must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *See id.* Under the second *Strickland* prong, Movant must demonstrate a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *See id.* at 694; *see also United States v. Nahodil*, 36 F.3d 323, 326 (3d Cir. 1994). The Court can choose to address the prejudice prong before the deficient performance prong, and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced. *See Strickland,* 466 U.S. at 668. Finally, although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that counsel's representation was professionally reasonable. *See id.* at 689.

In Claim One, Movant contends that defense counsel provided ineffective assistance by failing to argue that the correct Guidelines range was 27-33, rather than the 168-210 months range that was used by the Court.[3] (D.I. 103 at 3-5) Although Movant concedes that defense counsel

---

[3]The Court determined that Movant's Total Offense Level for Counts Three and Four was 35, and that Movant's Criminal History Category was I, producing a total advisory sentencing range of 168-210 months.

8

challenged the Government's calculation of the "loss" amount for purposes of the Guidelines calculation, he asserts that defense counsel was ineffective for not identifying the evidence in the record he believes would have demonstrated that the figures being used to calculate the loss amount were vastly inflated. (D.I. 103 at 4) Specifically, Movant complains that defense counsel failed to argue that the "infringement amount" offered by the Government did not represent any real loss to the victims. According to Movant, the infringement amount should have been measured by the value of the infringing item (*i.e.*, the counterfeit software) rather than by the value of the infringed item (*i.e.*, the legitimate software). (D.I. 104 at 5) Movant also asserts that the 144 months sentence he received, with the two-level downward variance from the 168-210 months Guidelines range, is significantly higher than the sentence he should have received based on the same downward variance from the "correct" 27-33 months Guidelines range. (D.I. 103 at 4)

The Court will provide a brief review of its calculation of the advisory Guidelines range before proceeding to Movant's ineffective assistance of counsel argument.

Movant received concurrent sentences of 60 on Count Three (Conspiracy to Commit Copyright Infringement) and 144 months on Count Four (Conspiracy to Commit Wire Fraud). (D.I. 85; D.I. 104 at 2; D.I. 114 at 14) After accounting for a three-level decrease for acceptance of responsibility, the Court determined that the Offense Levels for Counts Three and Four were 34 and 35, respectively. (D.I. 90 at 35) Pursuant to U.S.S.G. § 3D1.3, the Court used the higher of the two Offense Levels (Count Four – Conspiracy to Commit Wire Fraud) as the basis for calculating the advisory Guidelines range of 168-210 months. (D.I. 90 at 35; D.I. 104 at 2; D.I. 114 at 14) If the Court had used the lower Offense Level applicable to Count Three (Conspiracy to Commit Copyright Infringement), the advisory Guidelines range would have been 151-188 months.

9

### 1. Court's calculation of the "infringement amount" for Count Three

During sentencing, the Court concluded that the Probation Office appropriately calculated the "loss amount" for Count Three by using the "infringement amount" pursuant to U.S.S.G. § 2B5.3 and Application Note 2(A)(i). (D.I. 90 at 32) The "infringement amount" in this case was the retail value of the "infringed item" (*i.e.*, the legitimate software).[4] (D.I. 90 at 32) Then, using the retail value of legitimate copies of the software and concurring with the Government's conservative calculation that the "infringement amount" fell between $50 million and $100 million, the Court concluded that at least a 24-level enhancement should be applied under § 2B5.3(b)(1). (D.I. 90 at 32)

### (a) Value of the "infringed" item

Movant contends that the Court improperly used the retail value of the infringed item (legitimate software) to measure the infringement amount under U.S.S.G. § 2B5.3 and Application Note 2(A)(i). Instead, he asserts that the Court should have used the retail value of the infringing item (pirated software) to measure the infringement amount under Application Note 2(B).[5]

---

[4]Application Note 2(A) to § 2B5.3 provides:

> The infringement amount is the retail value of the infringed item, multiplied by the number of infringing items, in a case involving any of the following:
>
> > (i) The infringing item (I) is, or appears to a reasonably informed purchaser to be, identical or substantially equivalent to the infringed item; or (II) is a digital or electronic reproduction of the infringed item . . . .

U.S. Sentencing Guidelines Manual § 2B5.3 cmt. n. 2 (2013).

[5]Application Note 2(B), titled "Use of Retail Value of Infringing Item," provides: "The infringement amount is the retail value of the infringing item, multiplied by the number of infringing items, in any

10

Movant is mistaken. The Court used Application Note 2(A)(i) because the pirated software was a digital and electronic reproduction of the legitimate copyrighted software, and was also identical or substantially equivalent to the legitimate software. (D.I. 90 at 21, 29, 32; *see also United States v. Slater*, 348 F.3d 666, 669-70 (7th Cir. 2003) (affirming district court's use of retail value of legitimate versions of cracked software in calculating "infringement amount" under § 2B5.3(b)(1), and finding that cracked software programs are "digital copies that have been purged of copy-protection features and thus are easier to replicate than the originals")). At the time of his guilty plea, Movant admitted that he had obtained functioning copies of "software" that he then "cracked" and sold. (D.I. 89 at 18) He further agreed with the Government's Statement of Facts – read into the record at the plea hearing – which noted that Movant had reproduced and distributed "copyrighted software . . . [that] had been cracked by others." (*Id.* at 19) This meant that the license file that controlled the ability to copy and access the software had been circumvented. (*Id.* at 19-20)[6] With the access and copy controls disabled, the software itself worked perfectly well.

The record contains additional ample evidence supporting the conclusion that the pirated software was identical or substantially equivalent to authorized copies and that it was a digital or electronic reproduction of such. For instance, during the Change of Plea Hearing, Movant conceded that he engaged in over 700 transactions through which he distributed over $100 million of pirated software to over 400 customers located in at least 28 states and over 60 countries. (D.I.

---

case not covered by subdivision (A) of the Application Note . . . ." U.S. Sentencing Guidelines Manual § 2B5.3 cmt. n. 2.

[6]The license file was manufactured by a separate company, and is the actual file that was "cracked." The license file is not part of the software title itself. (D.I. 90 at 29) Thus, the cracked licensing file was a separate product that accompanied many of the software programs that were stolen and infringed in this case. (D.I. 89 at 18)

89 at 20) These functioning software titles were industrial-grade, digital tools used to design myriad products essential to daily life, the health and safety of the public, and U.S. national security. (*Id.*) Movant and others working with him obtained legitimate copies of the software by a variety of means, including: (1) hacking or otherwise gaining unauthorized access into private computer networks; (2) free software demonstration or trial copies (which limit modules or duration of access through license files); (3) website downloads; (4) unauthorized release of beta versions of software; (5) rogue employees providing the software to them; and (6) unscrupulous foreign distributors of the software. (D.I. 71 at 3) Consequently, Movant and others were altering the access and copy controls on legitimate versions of the software, which they would then copy and distribute. (*Id.* at 3-5) Thus, the items Movant sold were not even counterfeit or fake versions of the software but, rather, the "real thing," with the security features disabled. *See Slater*, 348 F.3d at 669-70 (explaining cracked software programs are "almost exact digital copies," which justifies use of retail value of infringed copy to calculate "infringement value").

Movant's email correspondence further supports the conclusion that he was distributing digital reproductions of authentic software. Between February 2008 and June 2011, Movant and his customers exchanged over 25,000 e-mails relating to pirated software. (D.I. 71 at 5-6) In these emails, Movant represented that the cracked software functioned perfectly. For instance, when a customer asked if the software he was buying from Movant was "a complete version" and whether a "dongle [was] needed or included," and "what about updates," Movant wrote: "this is cracked version . . . no need dongle . . . only the version no updates." (D.I. 71 at 6) (citing emails of 2/11/10 (Ex. 7) and 8/23/09 (Ex. 8)) Another customer questioned Movant about the installation process, reporting that he was receiving a message that the access license would expire on "22 JAN

12

2010." (D.I. 71 at 6) (citing email of 1/8/10 (Ex. 9)) Movant responded that the software would remain operational beyond the "trial" period because Movant had altered the time limit set in the license file source code: "this is cracked versin! There is no limit you know?? you see? I edit the time . . . ." (*Id.*)

Some of Movant's biggest customers who used cracked versions of the software in place of authorized versions were Americans who held significant engineering positions, and security clearances, with government agencies and government contractors.[7] Additionally, between January 2010 and June 2011, undercover law enforcement agents made a series of purchases of pirated software advertised on Movant's website. The agents provided the purchased pirated software to the manufacturers, and those manufacturers confirmed that the software was a working version of their copyrighted software; the manufacturers further provided retail pricing data for those products. (D.I. 77 at 2 and Sealed Exs. 39-48) Explaining that the entire suite of functioning software modules was accessible after the licensing file was cracked, the Government stated:

> That is just a fact. And it's a fact that we know because that is what the companies told us. . . . [W]e went to the companies and asked

---

[7]For example, Movant sold and transmitted 12 cracked software programs over the internet to Cosburn Wedderburn, who was then a NASA electronics engineer, working at NASA's Goddard Space Flight Center, in Greenbelt, Maryland. Wedderburn used the cracked software for consulting jobs involving electronic and aerospace simulations, and also used the cracked software when he conducted a thermal simulation contract for China-based Huawei Technologies, Ltd. (D.I. 71 at 22-23) Movant also sold and transmitted 10 cracked software programs over the internet to Dr. Wronald Best, the "Chief Scientist" at a Kentucky-based government contractor that services U.S. and foreign militaries and law enforcement with a variety of applications such as radio transmissions, radar usage, microwave technology, and vacuum tubes used in military helicopters. (D.I. 71 at 23) Dr. Best used this cracked software to design components used in military helicopters (including the Blackhawk helicopters), Patriot missiles, police radars, and breathalyzer equipment used by the many police departments in the United States. Dr. Best even used the cracked software to design a component used in the weather radar system employed in the Presidential helicopter fleet – "Marine One." (*Id.*)

13

> them to forensically analyze the files that we had obtained and this is
> what they determined.

(D.I. 90 at 28-29)

Movant's attempt to rebut the above factual record is unavailing. He argues that the pirated software did not meet the standards of Application Note 2(A)(i) because it lacked packaging, updates, customer service access, and the security features Movant and others disabled. (D.I. 104 at 6-7) As the record shows, none of these missing items impacted the functionality of the software version that was purchased; to the contrary, in the eyes of the individuals who purchased and used the pirated software, the pirated software was substantially identical to non-cracked versions. *See generally Slater*, 348 F.3d at 669-70.

For all of these reasons, the Court properly utilized the value of the infringed item under U.S.S.G. § 2B5.3 and Application Note 2(A)(i) to determine the infringement amount.

### (b) Retail value of the software

Movant accuses the Government of "grossly exaggerat[ing]" the retail value of the software as falling between $50 and $100 million, asserting that the correct retail value of the infringed items "is more like $2.5 million." (D.I. 104 at 10) He repeats the defense argument made during sentencing that genuine copies of the same software Movant pirated could be purchased for a fraction of the prices cited by the software manufacturers and relied on by the government. (D.I. 104 at 10) In essence, Movant asks the Court to take his word over that of the victim companies themselves, which provided actual pricing lists for many of the actual software versions and modules that Movant stole and sold. ( D.I. 77 at 2 and Exs. 39-48; D.I. 90 at 21-22, 28-29)

Movant's challenge to the final figure used for the retail value of the software is unavailing. First, Movant offers no basis for concluding that the retail pricing data from the manufacturers for

14

the actual products in question do not reflect pricing "in the market in which [the products are] sold." U.S. Sentencing Guidelines Manual § 2B5.3 cmt. n. 2(C); *see also United States v. Susel*, 429 F.3d 782 (8th Cir. 2005) (affirming use of retail value of software stolen from manufacturer and sold on eBay based on retail pricing data provided by manufacturer). Second, Movant essentially seeks to engraft a requirement of establishing retail value with mathematical precision onto the reasonable estimation of pecuniary harm permitted under U.S.S.G. §§ 2B5.3(b) and 2B1.1(b). Section 2B5.3 "treats copyright and trademark violations much like theft and fraud," which means that "similar to the loss enhancement in the theft and fraud guideline, the infringement amount . . . serves as a principal factor in determining the offense level." U.S. Sentencing Guidelines Manual § 2B5.3 cmt. Background. Courts are only required "to make a reasonable estimate of loss," and they can take into account such factors as "the fair market value of the property unlawfully taken [or] copied." U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n. 3(C); *see also United States v. Fumo*, 655 F.3d 288, 310 (3d Cir. 2011).

In addition, Movant mischaracterizes the pricing data by describing all of it as "MSRP" [manufacturers suggested retail price], ignoring the explanations within the pricing data documentation about variances from listed prices based on such factors as number of copies purchased, length of licenses, total modules purchased, and type of customer (government versus private).[8] (D.I. 79 at Exs. 39-47) For instance, Movant ignores that Dassault provided actual pricing

_____

[8]Movant's suggestion that a court commits error -- warranting § 2255 relief -- by considering a manufacturer's suggested retail price for an infringed item is incorrect. *See, e.g., United States v. Hucks*, 557 F. App'x 183, 187-88 (3d Cir. 2014) (using "retail price" range for Viagra and Cialis to calculate "infringement amount" related to counterfeit pills); *Susel*, 429 F.3d at 784 (using retail price of stolen software sold on eBay to calculate "loss" amount for mail fraud).

15

under a particular contract for the modules that Movant cracked and distributed, totaling $3.812 million per copy. (D.I. 79 at Ex. 44) Based solely on Movant's sale of 16 copies of this software, the Government calculated that the retail value of this stolen software was $60,005,865.12, which is sufficient by itself to support the 24-level enhancement for an infringement amount exceeding $50 million. (D.I. 71 at 18-19; U.S. Sentencing Guidelines Manual §§ 2B5.3(b)(1) & 2B1.1(b)(1)(M).[9]

Moreover, as noted in the Government's Sentencing Memorandum, the summary retail pricing charts (and the attached pricing data that underlies those charts) were conservative estimates of only a fraction (about 22%) of the total pieces of software that Movant unlawfully copied and distributed. (D.I. 71 at 18-20) Indeed, the first chart summarizes retail prices for only 144 of more than 700 unlawful transactions. The second chart summarizes retail prices for only those software programs that Movant delivered to the agents in Saipan. During the sentencing hearing, the Government explained that it "stopped counting" once the value exceeded $100 million. (D.I. 90 at 21)

Based on this record, the Court concludes that it correctly calculated the retail value of the infringed software.

## 2. Court's determination of the "loss" amount under Count Four

Movant further contends that the Court erred by using the "infringement amount" (*i.e.*, the retail value of the infringed software) it used for Count Three also to calculate the "loss amount" for

---

[9]Movant cites *United States v. Karadimos*, 479 F. App'x 144 (9th Cir. 2012), but it is unhelpful to him. (D.I. 104 at 11) In *Karadimos*, no manufacturer of an infringed item analyzed the pirated software, determined which versions/modules were pirated, and then submitted actual pricing data for the software products at issue. Instead, on direct appeal, the *Karadimos* Court found insufficient evidence to support an infringement amount based solely on MSRP figures provided by a software industry trade group.

16

Count Four, because (1) "infringement amount" and "loss" are "two very different concepts" under U.S.S.G. §§ 2B1.1 and 2B5.3, and (2) Count Three involved a copyright infringement conspiracy whereas Count Four involved a wire fraud conspiracy. (D.I. 104 at 3-4)

The Court is not persuaded by Movant's argument. Pursuant to Application Note 3 of § 2B1.1, courts are only required "to make a reasonable estimate of loss," which can take into account such factors as "the fair market value of the property unlawfully taken [or] copied. . . ." U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n. 3(C); *see also Fumo*, 655 F.3d at 310. The concept of "actual loss" under § 2B1.1 focuses on "reasonably foreseeable pecuniary harm," with "pecuniary harm" encompassing "harm that is monetary or that otherwise is readily measurable in money." U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n. 3(A)(i),(iii). The use of the retail value of stolen software is a reasonable estimation of "pecuniary harm." *See, e.g., Hucks*, 557 F. App'x at 185-86 (using retail value of Viagra and Cialis to calculate both "infringement amount" and "loss" under §§ 2B5.3 and 2B1.1); *Susel*, 429 F.3d at 783-84 (using retail value of stolen software to calculate "infringement amount" and "loss" for purposes of mail fraud and copyright infringement convictions).[10]

In intellectual property crime cases, sections 2B1.1 and 2B5.3 are typically read in conjunction with each other, and "a commonsense analysis confirms that the retail price is the appropriate measure of the economically realistic pecuniary impact on the victim." *United States v.*

---

[10]Retail pricing is not the only possible measure of "loss," or "pecuniary harm," under § 2B1.1. Illustrating the flexible nature of the analysis, some courts have used the research and development costs of the stolen intellectual property as a reasonable estimate of "pecuniary harm" under § 2B1.1. *See, e.g., United States v. Four Pillars Enter. Co.*, 253 F. App'x 502, 512 (6th Cir. 2007) (research and development costs of stolen formulas); *United States v. Ameri*, 412 F.3d 893 (8th Cir. 2005) (research and development costs of stolen proprietary software).

*Lige*, 635 F.3d 668, 671-72 (5th Cir. 2011) ("[T]he pecuniary harm is the loss of the phones, whose value is determined by the price a willing buyer would pay to Sprint or Nextel."). Movant offers no persuasive reason as to why these sections cannot be read together in this case,[11] nor does he demonstrate why the retail value of the stolen software cannot be used as a reasonable estimate of pecuniary harm under § 2B1.1. (D.I. 104 at 3-4) Consequently, the Court rejects Movant's contention that the measure of loss "has no basis in the Guidelines Manual at all," and that the "24-level adjustment in the Count 4 calculation for [this] case was invented from whole cloth." (D.I. 104 at 3)

In sum, the Court correctly calculated the advisory Guidelines range using the "infringement value" and "loss" based on the retail value of the software unlawfully obtained, reproduced, and distributed by Movant. Therefore, Movant has failed to demonstrate a reasonable probability that the outcome of his sentencing hearing would have been different but for defense counsel's failure to

---

[11] Movant's attempt to support his argument by citing *United States v. Bao*, 189 F.3d 867 (9th Cir. 1999), and *United States v. Cho*, 136 F.3d 982 (5th Cir. 1998), is unavailing. (D.I. 104 at 3-4) Both *Bao* and *Cho* involved a former version of U.S.S.G. § 2B5.3, which required the "retail value" to be based on the value of the "infringing items." *See Bao*, 189 F.3d at 867; *Cho*, 136 F.3d at 983-84. Section 2B5.3 was amended in May 2000 to provide "that the value of loss is to be measured according to the retail value of the 'infringed item.'" *Slater*, 348 F.3d at 669-70 (discussing amendment). *Cho* was an appeal from a sentence for trafficking in counterfeit handbags, in which the Fifth Circuit held that the retail value of the infringing item should determine the loss (and therefore the enhancement) under § 2F1.1 – the predecessor to § 2B1.1. *See Cho*, 136 F.3d at 983-85. *Bao* was an appeal from a sentence for trafficking in counterfeit copies of manuals for Microsoft Windows 95. *See Bao*, 189 F.3d at 866-67. The defendant in *Bao* challenged the district court's valuation of the manuals for purposes of the "loss" enhancement calculation under § 2B5.3 and former § 2F1.1 at $50 each, based on the price of the entire Windows 95 package (which included the manuals). The Ninth Circuit held that the district court should have valued the manuals at $12 each, based on testimony from a Microsoft employee that this was their value if sold individually and separately from the entire software package. *See id.* The Ninth Circuit held that the "retail value of the manuals, not the 'loss' derived from their production, is the proper measure for determining the sentencing enhancement applicable to Bao under § 2B5.3 and § 2F1.1." *Bao*, 189 F.3d at 867.

18

make the arguments he proposes in this proceeding. Movant's failure to satisfy the prejudice prong of *Strickland* provides a sufficient basis for denying Claim One as meritless.

### 3. Alternate prejudice conclusion

Movant also contends that counsel should have argued that the Adjusted Offense Level on Count 4 was substantially lower than what was calculated at sentencing, because this would have resulted in the Court using the Adjusted Offense Level for Count 3 to determine the advisory Guidelines range. *See* U.S.S.G. § 3D1.3. According to Movant, using Count 3 to determine the advisory Guidelines range would have resulted in a substantially lower sentence.

This argument is unavailing for two reasons. First, as previously explained, the Court correctly calculated the "infringement amount" under Count 3 and correctly determined the Adjusted Offense Level for Count 3 was 34. As such, using Count 3 to calculate Movant's sentence would have resulted in an advisory Guidelines range of 151-188 months. Since Movant's current sentence of 144 months is lower than that range, Movant cannot demonstrate prejudice under *Strickland*.

Movant's argument is also unavailing because it appears to be premised on his unwarranted assumption that the Court's sentence was ultimately driven by the advisory Guidelines range, when, in fact, the Court's sentencing decision was based upon its consideration of the totality of relevant factors under § 3553(a). (D.I. 90 at 56-63) During the sentencing hearing, the Court acknowledged that it was required to "make an individualized assessment of the sentence based on the facts presented," and "ultimately . . . impose a sentence that is sufficient, but not greater than necessary, to achieve all of the purposes of sentencing." *Id.* at 56. After noting that it did not "think the sentencing guidelines [we]re unreasonable under the circumstances," the Court stated that it did

19

"find that they are just a little bit higher than . . . is warranted under all of the circumstances, considering all of the statutory factors [that were] just touched upon." *Id.* at 63. Consequently, the Court imposed a  sentence it found "reasonable and appropriate" under § 3553. *Id.*

Thus, even if Movant could establish an error in the Court's Guidelines calculation (which he has failed to do), he cannot demonstrate constitutional prejudice. *See generally Hawkins v. United States*, 706 F.3d 820, 823-24 (7th Cir. 2013) (error in calculating advisory Guidelines range does not entitle defendant to collateral relief because court must ultimately sentence defendant under § 3553(a) factors irrespective of Guidelines calculations).

#### 4. Defense counsel's performance was not deficient

Claim One also does not warrant relief because Movant has failed to demonstrate that defense counsel's performance was "objectively unreasonable." During the plea hearing, defense counsel reserved the right to object to the "infringement amount" and "loss" enhancement, making clear that he understood these issues would be potentially significant factors in sentencing. (D.I. 89 at 20, 25) Prior to sentencing, defense counsel submitted a sentencing memorandum challenging the Probation Office's calculation in the PSR of the pecuniary harm as exceeding $50 million and offering contrary evidence of the retail value of the software. (D.I. 72, at 3-6; D.I. 75) Finally, during sentencing, defense counsel objected to the PSR's calculation of the pecuniary harm as exceeding $50 million. (D.I. 72 at 3; D.I. 90 at 13-15) The fact that the Court ultimately rejected defense counsel's objection -- after concluding that the Government had carried its burden of proving by a preponderance of the evidence that a reasonable estimate of the pecuniary harm exceeded $50 million (D.I. 90 at 31) -- does not render his performance constitutionally deficient.

20

In sum, the Court will deny Claim One as meritless because Movant has not satisfied either prong of the *Strickland* standard. Accordingly, the Court will deny movant's § 2255 motion in its entirety.

## V.   EVIDENTIARY HEARING

Section 2255 requires a district court to hold a prompt evidentiary hearing unless the "motion and the files and records of the case conclusively show" that the Movant is not entitled to relief. 28 U.S.C. § 2255; *see also United States v. Booth*, 432 F.3d 542, 545-46 (3d Cir. 2005); *United States v. McCoy*, 410 F.3d 124, 131 (3d Cir. 2005); Fed. R. Civ. P. 8(a), 28 U.S.C. foll. § 2255. As previously explained, the record conclusively demonstrates that Movant is not entitled to relief. Therefore, the Court will deny Movant's § 2255 Motion without an evidentiary hearing.

## VI.   CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2255 motion must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability is appropriate only if the movant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Movant must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

The Court concludes that Movant's claims do not warrant relief, and is persuaded that reasonable jurists would not find this assessment debatable. Therefore, the Court will not issue a certificate of appealability.

21

## VII.   CONCLUSION

For all of the foregoing reasons, the Court will dismiss Movant's 28 U.S.C. § 2255 Motion to Vacate, Set Aside, or Correct Sentence without an evidentiary hearing. Additionally, the Court will not issue a certificate of appealability. The Court shall issue an appropriate Order.

22